**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| EMILY NAUGHTON, individually and on behalf of herself and all others similarly situated, | CASE NO.: ___4:20-cv-367___ |
| Plaintiff, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| EVENFLO COMPANY, INC., | |
| Defendant. | |
| _____/ | |

**CLASS ACTION COMPLAINT**

Plaintiff, Emily Naughton ("Plaintiff"), by and through the undersigned counsel, on behalf of herself and all others similarly situated, brings this Class Action Complaint against Defendant, Evenflo Company, Inc. ("Defendant" or "Evenflo"), and in support alleges, upon information and belief and based on the investigation to date of her counsel, as follows:

**INTRODUCTION**

1.      Every parent remembers the first drive home from the hospital with a newborn baby.  Leading up to that big day, parents purchase what they believe to be a safe car seat, spend even more time ensuring that the car seat is properly installed in their vehicles, and then proceed to drive home at a cautious speed of approximately 12 miles per hour.

2.      As children grow and develop, so do their needs with respect to car seats.  The American Academy of Pediatrics ("AAP") recommends that infants and toddlers ride in rear-facing car seats as long as possible, until they reach the top height or weight limit allowed by

1

the car seat manufacturer.[1]  In recent years, car seat manufacturers have created seats that allow children to remain rear-facing until they weigh 40 pounds or more, which means that most children can remain rear-facing past their second birthday.  *Id.*  When children outgrow the allowable height and weight limitations of their rear-facing car seats, they transition to forward-facing car seats featuring harnesses.  *Id.*  Again, the AAP recommends that children ride in forward-facing car seats with harnesses as long as possible, until they reach the top height or weight limit allowed by the car seat manufacturer.  *Id.*  Many forward-facing car seats with harnesses accommodate children up to 65 pounds or more.  *Id.*  Once children reach the top height or weight limit allowed by the forward-facing car seat manufacturer, they graduate to a belt-positioning booster seat (which does not feature a harness) until the vehicle's lap and shoulder seat belt fit properly, which is typically when children are at least 4 feet, nine inches in height and are 8 to 12 years old.  *Id.*

3.      While the type and size of a child's car seat may change over time, the one constant is parents' commitment and determination to ensure the safety of their children.  To this end, parents with children of every age strive to identify and purchase safe car seats from reputable manufacturers.  Since the average parents are not in a position to conduct their own safety testing, in order to make informed purchasing decisions, they must rely on the marketing, labeling, and representations of car seat manufacturers regarding the safety of a given car seat and its appropriateness for children of a specific age and/or size.  But what happens when a car seat manufacturer puts profits before child safety and misrepresents the safety or suitability of its car seats?  This is the situation in the instant case.

---

[1] https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Updates-Recommendations-on-Car-Seats-for-Children.aspx (last visited March 3, 2020).

4.     Evenflo has manufactured, marketed, distributed, and sold car seats since 1995.[2]

On its website and car seat packaging, Evenflo claims that "Safety is our #1 priority."[3]

5.     Evenflo's website includes a page entitled "Our Promise On Safety," wherein

Defendant states:

> To us, it just doesn't get much more important than delivering
> products that help keep your little ones safe. We're parents just
> like you are so we build products that we would trust and use for
> our own children. That's why we rigorously test all of our
> products again and again. Every bounce, twist, turn and latch is
> tested to make sure our products are safe, durable and
> comfortable.
>
> Evenflo tests all of our car seats to energy levels approximately
> twice that of the federal crash test standard. Additionally, our
> engineers developed the Evenflo Side Impact test protocol, which
> simulates the energy in severe 5-star government side impact tests
> conducted for automobiles.[4]

6.     The Big Kid booster seat ("Booster Seat") is one of several car seat models

manufactured, marketed, and sold by Evenflo.

7.     Defendant offers five models of the Booster Seat: the 2-in-1, the Amp 2-in-1, the

LX 2-in-1, the Sport, and the Essential.[5]  According to Defendant's website, the price range for

---

[2] https://www.evenflo.com/about/about-us.html (last visited March 3, 2020).

[3] https://www.evenflo.com/car-seats/ (last visited March 3, 2020).

[4] https://www.evenflo.com/safety-learning/promise-on-safety.html (last visited March 3, 2020).

[5] https://www.evenflo.com/car-seats/ (last visited March 3, 2020).

the three models is $39.99 to $44.99.  *Id*.  To date, Defendant has sold more than 18 million

Booster Seats.[6]



**Amp 2-in-1 Model**



**2-in-1 Model**



**LX 2-in-1 Model**



**Sport Model**

---

[6] https://www.propublica.org/article/evenflo-maker-of-the-big-kid-booster-seat-put-profits-over-child-safety (last visited March 3, 2020).



**Essential Model**

8.     The Booster Seat is marketed and sold by numerous nationwide retailers, including Target, Walmart, Kohl's, and Buy Buy Baby, as well as online via Defendant's own website, Amazon, and the websites of the aforementioned retailers.

9.     For years, Defendant marketed that its Booster Seat is appropriate for children weighing less than 40 pounds, has been side impact tested, and "meets or exceeds all applicable federal safety standards and Evenflo's side impact standards."[7]

---

[7] https://www.evenflo.com/car-seats/big-kid/us_bigkid.html?dwvar_us__bigkid_fashion=31912230&cgid=car-seat-booster#start=8 (last visited March 3, 2020).



**Packaging states "30-110 lbs."**

10.   To the detriment of parents and children nationwide, Defendant's marketing of the Booster Seat is deceptive and misleading, as the use of booster seats by children weighing less than 40 pounds is in direct contravention to the safety recommendations of the AAP, and further, there is no federal safety standard or test governing side impact for car seats.  Given the absence of any such standard or test, Defendant created its own test – with no basis in safety or science – and then proceeded to consistently give itself a passing grade and market the Booster Seat as "side impact tested."

11.   Contrary to Evenflo's marketing and safety representations, it has recently been revealed that Defendant has known for a significant period of time that the Booster Seat is <u>not</u>

safe for children lighter than 40 pounds, and that Defendant's own testing confirmed that a child seated in the Booster Seat could be in grave danger in the event of a side-impact collision.[8]

12.    Sadly, the real-world repercussions of Defendant's dangerous deception and misrepresentations have been established by the unforgiveable and irreversible aftermath of car accidents involving children weighing less than 40 pounds who were seated in Defendant's Booster Seat during the time of their accidents.

13.    If Defendant had been honest and not deceptively misrepresented the very real safety risks posed by its Booster Seat in the event of a side-impact collision, no parent would have ever purchased Defendant's Booster Seat.

14.    Plaintiff filed this case in order to address Defendant's deception and misrepresentations in connection with the Booster Seat, as discussed in greater detail below.

## PARTIES

15.    Plaintiff, Emily Naughton, is a resident and citizen of Washington, Franklin County, Missouri.

16.    Defendant, Evenflo Company, Inc., is an Ohio corporation with its principle place of business located in Miamisburg, Ohio.  Defendant is a wholly-owned subsidiary of China-based Goodbaby International Holdings Limited and manufactures, markets, and sells car seats and other baby and child-related products.  Upon information and belief, Defendant's deceptive conduct originated from its principle place of business in Ohio and was uniformly disseminated nationwide.

---

[8] https://www.propublica.org/article/evenflo-maker-of-the-big-kid-booster-seat-put-profits-over-child-safety (last visited March 3, 2020).

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because (1) there are more than one hundred Class Members, (2) there is an aggregate amount in controversy exceeding $5,000,000.00, exclusive of interest and costs, and (3) there is minimal diversity because Plaintiff and Defendant are citizens of different states.  This Court also has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

18.    This Court has personal jurisdiction over Defendant because Defendant does substantial business in this state and within this District, receives substantial compensation and profits from the marketing, distribution, and sale of its products in this District, and has engaged in the unlawful conduct described in this Class Action Complaint within this District.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## THE DEVELOPMENT OF CAR SEATS

20.    The first child restraint systems were introduced in 1968, and the first child passenger safety law was passed in Tennessee 10 years later.[9]

21.    In the late 1970s, the U.S. public's increasing awareness of the high rates of morbidity and mortality for child passengers resulted in rapid proliferation of state laws on the issue.[10]

---

[9] https://www.sun-sentinel.com/entertainment/sfp-then-and-now-25-years-of-car-seat-safety-20150828-story.html (last visited March 3, 2020).

22.     Between 1977 and 1985, all 50 states adopted one or more laws aimed at reducing harm to infants and child passengers by requiring the use of some sort of child restraint device. *Id*.

23.     In the early 1980s, crash testing for car seats became required.[11]

24.     Beginning in the 1990s, the National Highway Traffic Safety Association ("NHTSA"), as well as professional associations like the AAP, have developed child passenger safety standards and guidelines that cover a wider range of child passenger safety issues and better protect children from injuries.[12]   Among other things, they emphasized the importance of three types of safety practices in protecting child passengers: (1) device-based restraints that are tailored to the age/size of individual child passengers; (2) rear seating, and; (3) seatbelt wearing of minors who have outgrown child restraint devices but are still in need of supervision to comply with seatbelt requirements.  *Id*.

25.     In the early 2000s, the CDC Task Force strongly recommended that states adopt laws mandating the use of age and size appropriate child restraints.  *Id*.  Subsequently, the NHTSA and AAP guidelines were updated with similar emphasis.  *Id*.

---

[10] Child Passenger Safety Laws in the United States, 1978–2010: Policy Diffusion in the Absence of Strong Federal Intervention, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3899584/ (last visited March 3, 2020).

[11] https://www.sun-sentinel.com/entertainment/sfp-then-and-now-25-years-of-car-seat-safety-20150828-story.html (last visited March 3, 2020).

[12] Child Passenger Safety Laws in the United States, 1978–2010: Policy Diffusion in the Absence of Strong Federal Intervention, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3899584/ (last visited March 3, 2020).

26.     The first booster seat law was implemented in 2000, when Washington state, and then California, implemented laws requiring booster seats for children over 40 pounds.[13]

27.     Specifically, the AAP guidelines are as follows:[14]

| Age Group | Type of Seat | General Guidelines |
|---|---|---|
| Infants and Toddlers | Rear-Facing Only<br><br>Rear-Facing Convertible | All infants and toddlers should ride in a rear-facing seat until they reach the highest weight or height allowed by their car seat manufacturer. Most convertible seats have limits that will allow children to ride rear facing for 2 years or more. |
| Toddlers and Preschoolers | Forward-Facing Convertible<br><br>Forward-Facing with Harness | Children who have outgrown the rear-facing weight or height limit for their convertible seat should use a forward-facing seat with a harness for as long as possible, up to the highest weight or height allowed by their car seat manufacturer. Many seats can accommodate children up to 65 pounds or more. |

---

[13] https://www.sun-sentinel.com/entertainment/sfp-then-and-now-25-years-of-car-seat-safety-20150828-story.html (last visited March 3, 2020).

[14] https://www.healthychildren.org/English/safety-prevention/on-the-go/Pages/Car-Safety-Seats-Information-for-Families.aspx (last visited March 3, 2020).

| School-Aged Children | Booster | All children whose weight or height exceeds the forward-facing limit for their car safety seat should use a belt-positioning booster seat until the vehicle seat belt fits properly, typically when they have reached 4 feet 9 inches in height and are 8 through 12 years of age. All children younger than 13 years should ride in the back seat. |
| --- | --- | --- |
| Older Children | Seat Belts | When children are old enough and large enough for the vehicle seat belt to fit them correctly, they should always use lap and shoulder seat belts for the best protection. All children younger than 13 years should ride in the back seat. |

**THE DEVELOPMENT OF THE EVENFLO BOOSTER SEAT**

28.    Evenflo introduced the Booster Seat in the early 2000s in an effort to compete in the developing booster seat category, which was prompted by certain states requiring school-age children to use such seats until they could fit in regular seat belts.[15]  Evenflo's internal records

---

[15] https://www.propublica.org/article/evenflo-maker-of-the-big-kid-booster-seat-put-profits-over-child-safety (last visited March 3, 2020).

11

indicate that the Booster Seat was specifically developed for the purpose of "regaining control in the market" from Graco, which was marketing its booster seat as safe for children at least 3 years old with a minimum weight of 30 pounds and minimum height of 38 inches. *Id.* With this goal in mind, Defendant priced its Booster Seat at $10 less than Graco's seat and marketed the Booster Seat as safe for babies as young as 1 year old with a minimum weight of 30 pounds and no minimum height. *Id.*

29.     There is scientific consensus that booster seats do not adequately protect toddlers. To get the full safety benefit in a crash, the adult seat belt has to remain on the strong parts of a child's body: across the middle of the shoulder and across the upper thighs. Even if toddlers are tall enough for the belt to reach the shoulders, children that young rarely sit upright for long and often wriggle out of position. *Id.* "In contrast, a tightly adjusted five-point harness secures shoulders and hips, and goes between the legs. Harnesses secure children's bodies so that they are less likely to be ejected and disperse the crash forces over a wider area. There's a reason NASCAR drivers wear harnesses." *Id.*

30.     Defendant markets, packages, and labels its Booster Seat as "side impact tested." This claim appears on the product box, and on a permanent tag affixed to the Booster Seat itself.



**Evenflo's Booster Seat Packaging Features "Side Impact Tested" Claim**



**Label on Booster Seat Indicating "Side Impact Tested"**

31.    Clearly, Defendant included the claim of "side impact tested" on the packaging and stitched it onto product itself to appeal to safety-conscious parents and to indicate to reasonable consumers that the Booster Seat is of a certain quality or standard and has satisfied or surpassed rigorous safety standard.  But in reality, the "side impact tested" representation is meaningless at best, and a dangerous deception at worst.

32.    The fact is, there is currently no government standard for testing car seat performance in side-impact collision scenarios.  Currently, the only government-issued standard

crash test involves simulated head-on collisions.[16]  Defendant took advantage of this regulatory gap and seized the opportunity to concoct its own side impact testing, the specifics of which have never been voluntarily disclosed to consumers.  *Id.*  Had the specifics of Defendant's "side impact testing" been disclosed to consumers, including Plaintiff, they would not have purchased the Booster Seats.

33.    Side impact collisions were responsible for more than a quarter of deaths of children under 15 killed in vehicle collisions in 2018.[17]  While less common than head-on crashes, side impacts are more likely to result in serious injuries because there is only a door separating the passenger from the intruding vehicle.  *Id*.

34.    On its website, Defendant communicates through its marketing to consumers that its side-impact testing is rigorous and simulates realistic side-impact crashes.  *Id*.

---

[16] Significantly, the lobbying efforts of the car seat manufacturing industry itself caused the further delay of establishing a side-impact safety standard for car seats.  *See* https://www.propublica.org/article/the-car-seat-industry-helped-delay-a-child-safety-regulation-again (last visited March 3, 2020).

[17] https://www.propublica.org/article/evenflo-maker-of-the-big-kid-booster-seat-put-profits-over-child-safety (last visited March 3, 2020).

**Safety Testing**

At Evenflo, we continue to go above and beyond government standards to provide car seats that are tested at 2X the Federal Crash Test Standard.

- Side Impact Tested: Meets or exceeds all applicable federal safety standards and Evenflo's side impact standards.
- Designed and tested for structural integrity at energy levels approximately 2X the federal crash test standard.
- FMVSS 213: Federal Motor Vehicle Safety Standards for Child Restraint Systems
- FMVSS 302: Federal Motor Vehicle Safety Standards for Flammability of Interior Materials
- CMVSS 302: Canada Motor Vehicle Safety Standard
- CMVSS 213: Canada Motor Vehicle Safety Standard
- Evenflo Temperature Testing: All current Evenflo car seats are tested for product integrity at both high and low temperatures.

**Evenflo's Website Misleads Consumers to Believe Its Booster Seat Meets or Exceeds Federal Safety Standards for Side Impact Testing as well as Evenflo's Own Side Impact Standards**

35.    The truth is that Evenflo's side impact tests were anything but stringent, according to internal company documents.  Defendant's tests showed that when child-sized crash dummies seated in the Booster Seat were subjected to the forces of a T-bone collision, they were thrown far out of their shoulder belts.  Evenflo's top booster seat engineer would later admit in a deposition that if real children moved that way, they could suffer catastrophic head, neck and spinal injuries or die.  *Id*.

36.    Videos from the company's side-impact tests show child-sized dummies careening far outside the boundaries of the booster seat, where a child's head, neck and spine would be vulnerable.  While the purpose of a seat belt is to distribute the crash forces over the

strong bones of the body — the shoulders and hips — the Evenflo test instead showed the belt slipped off the shoulder and wound up taut around the soft abdomen and ribs. In real life, that could cause internal organ damage. *Id.*



**Video of Evenflo Side Impact Tests Show Child-Sized Dummies Thrown Violently Out of Shoulder Belts and Their Heads and Torsos Flying Outside the Seat**

37.    Defendant's side-impact collision test videos were shown to Dr. Benjamin D. Hoffman, a pediatrician and lead author of the AAP's car seat recommendations. *Id.* Dr. Hoffman opined that such violent movement at high speed of the dummy in the booster could lead to abdominal, brain and spinal injuries in a real child, including paralysis or death. *Id.* "This looks horrific, and I can't imagine it being in any way shape or form better under real life circumstances," Hoffman said. *Id.*

38.    Notwithstanding these horrific, simulated test results, because there is no regulatory standard for side-impact collision testing, Defendant has consistently given its own Booster Seat a passing grade by setting its internal test bar so low that, the only way to fail the

test was if the child-sized crash test dummy ended up on the floor or the Booster Seat itself broke into pieces.  *Id.*

39.    An Evenflo senior technician, Jeremy Belzyt, testified during a deposition that, after each side impact crash test, a technician would complete a form by checking "yes" or "no" as to whether the test showed "dummy retention."  *Id.*  When asked to explain the meaning of "dummy retention," Mr. Belzyt answered, "It's just did it stay in the seat or did it fall out of the seat and end up on the floor."  *Id.*

40.    During the aforementioned deposition, Mr. Belzyt was shown each of the following photos from Evenflo's self-conducted side impact tests.  In response to each photo, Mr. Belzyt confirmed that each of these would have resulted in a technician checking "yes" on the form for "dummy retention."  *Id.*  As a result, an Evenflo engineer decided that each of these Booster Seats passed the test.  *Id.*









**These Booster Seats Passed Evenflo's Internal Side Impact Testing**

41.    According to Belzyt, during his 13 years at Evenflo, he never performed a side impact test on a Booster Sear that was deemed to be a failure.  *Id.*

42.    Defendant further misleads consumers by claiming on its Booster Seat website, "**Side Impact Tested**: Meets or exceeds all applicable federal safety standards and Evenflo's side impact standards."[18]  Again, there is no federal safety standard for side impact, thus, it is deceptive for Defendant to indicate that its product has surpassed a nonexistent standard.

43.    Notwithstanding the fact that there is no federal safety standard for side impact, Defendant deceptively misrepresented on a website called "The Safety Net" that its "rigorous test simulates the government side-impact tests conducted for automobiles."

---

[18] https://www.evenflo.com/car-seats/big-kid/31911431.html (last visited March 3, 2020).



44.    Equally misleading is Defendant's representation on its website and packaging that its Booster Seat is designed and tested at "2X the Federal Crash Test Standard." *Id*. By not

identifying a particular standard, Defendant misleads reasonable consumers to believe that this is a reference to a federal side-impact standard. As discussed above, there is no such standard.

### Evenflo Modifies, But Does Not Improve the Booster Seat

45.      Beginning in 2007, Defendant began representing that the minimum age on the Booster Seat was 3 and, for the first time, listed a minimum height of 38 inches. *Id*. Evenflo warned that, failure to follow these instructions "can result in your child striking the vehicle's interior during a sudden stop or crash, potentially resulting in serious injury or death." *Id.*

46.      At no time did Defendant attempt to contact or otherwise communicate to consumers who previously purchased the Booster Seat based on the earlier representations as to the demographic for which the Booster Seat was appropriate.

47.      In February 2012, an Evenflo safety engineer, Eric Dahle, recommended to high-ranking Evenflo executives that the company stop selling the Booster Seat for children who weigh less than 40 pounds and increase the age rating to 4 years old. *Id*. Mr. Dahle presented the Evenflo executives with government research regarding the effectiveness of booster seats and advised that children lighter than 40 pounds would be safer in car seats that use harnesses, which would align with Canadian regulations and recommendations from the AAP. *Id*. According to Evenflo's internal records, marketing executive McKay Featherstone "vetoed" Mr. Dahle's recommendation on more than one occasion. *Id*. Evenflo refused to heed Mr. Dahle's advice because doing so would have placed Evenflo at a disadvantage alongside its main competitors, Graco and Dorel. Put simply, Defendant put profits ahead of child safety.

**A marketing executive vetoed an engineer's recommendation to stop marketing the Booster Seat as safe for children weighing less than 40 pounds or younger than four years old**

48.     Defendant's representations about the safety of its Booster Seat were further contradicted by one of its own project engineers, Joshua Donay, during a 2016 deposition in a case in Duval County Circuit Court in Florida, wherein Mr. Donay testified that he would "not put a 1-year-old in any belt-positioning booster, Big Kid, Graco, you name it.  I would keep them in an infant seat."  *Id.*

49.     Similarly, during a separate deposition in a separate lawsuit, the aforementioned safety engineer, Eric Dahle, testified that not only should a 1 year old never use the Booster Seat, but a 2 year-old should not either.  *Id.*

50.     By 2008, Graco products were still outselling Defendant's Booster Seat.  *Id.* Defendant believed that this was due to a perception issue – specifically, that Graco seats appeared to be safer in terms of providing more side support.  *Id.*

51.     In an effort to make the Booster Seat look safer, Defendant added side wings that extend from the backrest.  *Id.*  Defendant's internal documents listed one consumer benefit of the newly added side wings as "increased perceived side protection."  *Id.*

52.    Videos of Defendant's internal side impact testing show that, even with the addition of side wings, a child's head, neck, and spine remain vulnerable to serious injuries.  *Id*.

 

**Video of Evenflo Side Impact Tests Show Child-Sized Dummies Thrown Violently Regardless of Added Side Wings**

53.    Indeed, children placed in Defendant's Booster Seat have been severely and permanently injured, including internal decapitation and paralysis.[19]

54.    Consistent with Defendant's focus on providing the perception of safety, as opposed to providing actual safety, during a 2016 deposition in a negligence case involving the Booster Seat, an Evenflo engineer, David Sander, testified that "We side-impact test our seats, but I don't think we say that we offer any type of side-impact protection."  *Id*.

55.    On February 12, 2020, it was announced that the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy is launching an investigation of Defendant's Booster Seat.[20]

---

[19] https://www.propublica.org/article/evenflo-maker-of-the-big-kid-booster-seat-put-profits-over-child-safety (last visited March 3, 2020).

**PLAINTIFF'S FACTS**

56.     In or around October 2018, Plaintiff purchased an Evenflo Big Kid Booster Seat to use for her four year-old child.

57.     Plaintiff paid approximately $34.88 for the Booster Seat.

58.     As a reasonable consumer, Plaintiff perceived Defendant's representations regarding side-impact collision testing as an indication that the Booster Seat had succeeded under rigorous safety testing standards beyond those required by the government when, in fact, it did not.

59.     Plaintiff's decision to purchase the Booster Seat was directly impacted by Defendant's representations regarding its supposedly rigorous side-impact collision testing.

60.     Had Plaintiff known of the significant safety risks posed by Defendant's Booster Seat, and the low threshold for Defendant giving its own Booster Seat a passing grade regarding side-impact testing, she would not have purchased the Booster Seat for use by her child.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

61.     Defendant has had actual knowledge for several years that the marketing, packaging, and labeling of its Booster Seat was deceptive and misleading because Defendant's internal and undisclosed side-impact tests confirm that the Booster Seat poses serious safety risks to children, there are no government-issued side-impact safety standards that the Booster Seat could meet or exceed, and Defendant's own side-impact standards and testing are made up and not based on science or safety.

**Discovery Rule Tolling**

---

[20] https://www.propublica.org/article/house-subcommittee-opens-investigation-of-evenflo-maker-of-big-kid-booster-seats (last viewed March 3, 2020).

62.    During the period of any applicable statutes of limitation, Plaintiff and Class Members could not have discovered, through the exercise of reasonable diligence, that Defendant's Booster Seat is unsafe in the event of a side-impact collision.

63.    Plaintiff and Class Members did not discover, and did not have knowledge of, facts that would cause a reasonable person to suspect that Defendant's Booster Seat is unsafe in side-impact collision scenarios, or that Defendant's marketing, packaging, and labeling of the Booster Seat as "side impact tested" was false, deceptive, and/or misleading.

64.    Until recently, only Defendant had knowledge of the fact that its Booster Seat poses a serious safety risk to children.  Plaintiff, Class Members, and the public at-large had no way of obtaining knowledge of this important fact until ProPublica published a robust article exposing these facts on February 6, 2020.  While some of the information reported by ProPublica may have been disclosed in connection with earlier, individual litigation, it was sealed by the court or only available via a fee-based access system, such as CM/ECF, which the average person typically does not know how to access or navigate.

65.    Plaintiff and Class Members could not have reasonably discovered the true extent of Defendant's illegal conduct in connection with the safety risks posed by its Booster Seat until ProPublica published the aforementioned article on February 6, 2020.

66.    For the foregoing reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.


**Fraudulent Concealment Tolling**

24

67.    All applicable statutes of limitation have also been tolled by way of Defendant's fraudulent concealment of its internal side-impact collision testing through the relevant time period.

68.    Rather than disclose to Plaintiff and Class Members that Defendant's own side-impact collision testing confirmed that children using its Booster Seat are at risk of serious injury or death, Defendant continued to manufacture, market, and sell the Seat without disclosing this information.

**Estoppel**

69.    At all times relevant to this action, Defendant had a duty to disclose to Plaintiff, Class Members, and the public at-large, the serious risks posed to children by using the Booster Seat

70.    Defendant knowingly, affirmatively, and actively concealed or recklessly disregarded the serious risks of posed to children by using the Booster Seat, and persisted with the deceptive marketing of the Booster Seat as "side impact tested."

71.    For the foregoing reasons, Defendant is estopped from relying on any statutes of limitations in defense of the allegations raised in this Complaint.

## CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Classes:

Nationwide Class
All persons residing in the United States who purchased an Evenflo Big Kid booster seat between March 3, 2007 and the present.


Missouri Class

All persons residing in the state of Missouri who purchased an Evenflo Big Kid booster seat between March 3, 2007 and the present.

73.    Excluded from the Classes are Defendant, any entity in which Defendant has a controlling interest, any of Defendant's legal representatives, officers, directors, assignees, and successors, as well as the Judge handling the case, and his or her family members and staff.

74.    Plaintiff reserves the right to modify the Class definitions, if necessary, to include additional Big Kid car seat models, additional time periods, and/or other car seats manufactured by Defendant, but bearing different brand names, that were deceptively marketed and misrepresented to consumers.

75.    <u>Numerosity</u>:  The Members of the Classes are so numerous that joinder of all Members is impracticable.  While the exact number of Class Members is presently unknown, it consists of thousands of people geographically disbursed throughout the United States.  The number of Class Members can be determined by sales information and other records.  Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity.  The Class is readily identifiable from information and records in the possession of Defendant and its third-party distributors and retailers.

76.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members because Defendant has uniformly acted on grounds generally applicable to the Classes.  These common legal or factual questions include, *inter alia*:

    a.    Whether the Booster Seat is unsafe in side-impact collisions;

    b.    Whether Defendant knew or reasonably should have known that the Booster Seat was unsafe in side-impact collisions;

c.  Whether Defendant knew or reasonably should have known that the Booster Seat was unsafe in side-impact collisions before marketing, distributing, and selling the Booster Seat to Plaintiff and the Class Members;

d.  Whether Defendant knew or reasonably should have known that the Booster Seat was unsafe in side-impact collisions after marketing, distributing, and selling the Booster Seat to Plaintiff and the Class Members;

e.  Whether Defendant concealed from and/or failed to disclose to Plaintiff and Class Members that the Booster Seat is unsafe in side-impact collisions;

f.  Whether Defendant made affirmative misrepresentations regarding the side-impact testing of the Booster Seat;

g.  Whether Defendant made affirmative misrepresentations regarding the safety and appropriateness of the Booster Seat for children weighing less than 40 pounds;

h.  Whether Defendant acted to conceal from Plaintiff and Class Members the standards for its internal side-impact collision testing of the Booster Seat;

i.  Whether Defendant acted to conceal from Plaintiff and Class Members the results of its internal side-impact collision testing of the Booster Seat;

j.  Whether Defendant's conduct was knowing and willful;

k.  Whether Defendant violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*;

l.  Whether Defendant breached the express warranties relating to the Booster Seat;

m.  Whether Defendant was unjustly enriched by receiving money in exchange for the Booster Seat;

n.  Whether Defendant should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the Booster Seat;

o.  Whether Plaintiff and Class Members are entitled to damages, including compensatory, exemplary, statutory damages, treble damages, and/or punitive damages, and the amount of such damages;

p.  Whether Defendant should be enjoined from marketing, distributing, and selling the Booster Seat; and

q.  Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices in connection with the marketing, packaging, labeling and/or representations of the Booster Seat.

77.    Typicality:  Plaintiff's claims are typical of the other Class Members, as all Members of the Class were and are similarly affected by the same deceptive marketing, packaging, labeling, and misrepresentations in connection with Defendant's Booster Seat and Defendant's actionable conduct.  In addition, Defendant's conduct that gave rise to the claims of Plaintiff and Class Members is the same for all Members of the Class.

78.    Adequacy of Representation:  Plaintiff will fairly and adequately protect the interests of the Class because she has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.  Furthermore, Plaintiff has retained counsel experienced and competent in the prosecution of complex class action litigation.

79.    Injunctive/Declaratory Relief:  The elements of Rule 23(b)(2) are met here. Defendant will continue to commit the unlawful practices alleged herein, and Class Members

will remain at an unreasonable and serious safety risk as a result of the Booster Seat, which Defendant deceptively markets, packages, labels, and misrepresents with respect to its side-impact collision testing. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate with respect to the Class as a whole.

80. <u>Predominance</u>: The elements of Rule 23(b)(3) are met here. The common questions of law and fact enumerated above predominate over the questions affecting only individual Class Members, and a class action is the superior method for the fair and efficient adjudication of this controversy. The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of hundreds or thousands of claimants in one suit would be impracticable or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly-situated Plaintiffs.

81. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

82. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach of Express Warranty – Uniform Commercial Code**
**Mo. Rev. Stat. § 400.2-313**
**(Plaintiff Individually and on Behalf of the Missouri Subclass)**

83.     Plaintiff hereby realleges and incorporates by reference all allegations raised in the preceding paragraphs as if fully set forth herein.

84.     Plaintiff brings this cause of action individually and on behalf of the Missouri Subclass against Defendant.

85.     Plaintiff and Missouri Subclass Members are and were at all relevant times buyers under Mo. Rev. Stat. § 400.2-313, and bought the Booster Seat at issue for personal, family, and/or household purposes.

86.     Plaintiff and Missouri Subclass Members bought Defendant's Booster Seat either directly from Defendant or through retailers, such as Target, Walmart, Kohl's, Buy Buy Baby, and Amazon, among others.

87.     Defendant is and was at all relevant times a seller of the Booster Seat at issue under Mo. Rev. Stat. § 400.2-313.

88.     The Booster Seats at issue constitute goods under Mo. Rev. Stat. § 400.2-313.

89.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted through the terms of its express limited warranty that the Booster Seat was free of defects in material or workmanship.

90.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted through the marketing, packaging, and labeling of the Booster Seat that the product was "side impact tested" and that its side impact testing "meets or exceeds all applicable federal safety standards and Evenflo's side impact standards."

91.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted through the marketing, packaging, and labeling of the Booster Seat that the product was appropriate for children weighing 30 to 110 pounds, as well as for children weighing 40 to 110 pounds.

92.     Each model of the Booster Seat has an identical or substantially identical warranty.

93.     Plaintiff and Missouri Subclass Members have privity of contract with Defendant through their purchase of the Booster Seat, and through the express warranties that Defendant issued to its customers.  Defendant's warranties accompanied the Booster Seat and were intended to benefit end-users of the Booster Seat.  To the extent that Plaintiff and/or Missouri Subclass Members purchased the Booster Seat from third-party retailers, privity is not required because Plaintiff and Missouri Subclass Members are intended third-party beneficiaries of the contracts between Defendant and third-party retailers, and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailers.  In other words, the contracts are intended to benefit the ultimate consumer or user of the Booster Seat.

94.     Defendant made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiff, Missouri Subclass Members, and Defendant, and the foregoing express representations and warranties induced Plaintiff and the Missouri Subclass to purchase the Booster Seat. Plaintiff and Missouri Subclass Members relied on the foregoing express representations and warranties prior to purchasing the Booster Seat.

95.     Plaintiff and the Missouri Subclass Members have complied with all conditions precedent under the express warranty prior to pursuing this claim.

96.     In fact, Defendant's Booster Seat is not safe in the event of a side-impact collision because each of the express warranties is a false and misleading misrepresentation.

97.     Defendant breached these warranties and/or contract obligations by placing the Booster Seats into the stream of commerce and selling them to consumers, when the Seats are unsafe and pose a significant safety risk to children.  The lack of safety inherent in the Booster Seat renders it unfit for its intended use and purpose and substantially and/or completely impairs the use and value of the Booster Seat.

98.     Defendant breached its express warranties by selling the Booster Seats, which are in actuality not free of defects, are unsafe for use, and cannot be used for their ordinary purpose of protecting children in the event of a side-impact collision.  Defendant breached its express written warranties to Plaintiff and Missouri Subclass Members in that the Booster Seats were not safe for their intended purpose at the time that they left Defendant's possession or control and were sold to Plaintiff and Missouri Subclass Members, creating a serious safety risk to Plaintiff, Missouri Subclass Members, and their children.

99.     Defendant further breached its express warranty to adequately repair or replace the Booster Seat despite its knowledge of the defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing safe Booster Seats.

100.    To the extent that Defendant offers or offered to replace the Booster Seats, the warranty of replacement fails in its essential purpose given it is insufficient to make Plaintiff and Missouri Subclass Members whole because the warranty covering the Booster Seats gives Defendant the option to repair or replace the Booster Seats, where neither is sufficient.

101.    Accordingly, recovery by Plaintiff and Missouri Subclass Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

102.    Despite having actual and constructive notice and knowledge of the safety risks posed by the Booster Seat, Defendant failed to provide any relief to Plaintiff and Missouri Subclass Members, failed to provide a safe replacement Booster Seat to Plaintiff and Missouri Subclass Members, and otherwise failed to offer any appropriate compensation.

103.    The express written warranties covering the Booster Seats were a material part of the bargain between Defendant and consumers.  At the time it made these express warranties, Defendant knew of the purpose for which the Booster Seat was to be used.

104.    Defendant was provided constructive notice of the aforementioned breaches of the above-described warranties through the results of its own internal side impact testing, as well as through previous lawsuits against Defendant involving serious and permanent injuries sustained by children while using the Booster Seats.

105.    The Booster Seats that Plaintiff and Missouri Subclass Members purchased were uniformly deficient with respect to their ability to protect children in the event of a side-impact collision, which caused each of them damages including loss of the benefit of their bargain.

106.    Plaintiff and Missouri Subclass Members were injured as a direct and proximate result of Defendant's breach of its express warranties because they did not receive the benefit of the bargain, lost the product's intended benefits, and suffered damages at the point-of-sale, as they would not have purchased the Booster Seats if they had known the truth about the unreasonable safety risk to children posed by the Booster Seats.

**COUNT II**
**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. §§ 407.010, *et seq*.**
**(Plaintiff Individually and on Behalf of the Missouri Subclass)**

107.    Plaintiff hereby realleges and incorporates by reference all allegations raised in the preceding paragraphs as if fully set forth herein.

108.    Plaintiff brings this cause of action individually and on behalf of the Missouri Subclass against Defendant.

109.    Plaintiff and Missouri Subclass Members were at all relevant times consumers under the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.* (the "MMPA").

110.    Plaintiff and Missouri Subclass Members purchased Defendant's Booster Seat primarily for personal, family or household purposes.

111.    Defendant was at all relevant times engaged in "trade" or "commerce" under the MMPA by way of its manufacturing, distributing, selling, marketing, advertising, labeling and packaging the Booster Seat at issue.

112.    Defendant's Booster Seat constitutes "merchandise" under the MMPA.

113.    Defendant's foregoing acts and practices, including its deceptive and fraudulent misrepresentations and omissions in the conduct of trade or commerce, were directed at consumers, including Plaintiff and Missouri Subclass Members.

114.    Defendant's foregoing deceptive and fraudulent acts and practices, including its omissions, were material, in part, because they concerned an essential part of the Booster Seats' intended use and provision of safety to children.  Defendant omitted material facts regarding the safety (or lack thereof) of the Booster Seat by failing to disclose the results of its internal side impact testing, or that the Seat will not adequately protect children in the event of a side-impact collision.  Rather than disclose this information, Defendant marketed and labeled the Booster Seat as "side impact tested" and misrepresented that the Seat "meets or exceeds all applicable federal safety standards and Evenflo's side impact standards."

115.   The Booster Seat poses an unreasonable risk to the safety of children in the event of a side-impact collision, despite Defendant's representation that the Seat is "side impact tested."

116.   Defendant did not disclose this information to consumers, including Plaintiff and Missouri Subclass Members.

117.   Defendant's foregoing deceptive acts and practices, including its omissions while engaged in business, were and are deceptive acts or practices in violation of §§ 407.020, in that:

   a.   Defendant manufactured, labeled, packaged, marketed, advertised, distributed, and/or sold the Booster Seats as "side impact tested," when, through its own internal side impact testing it knew, or should have known, that the Booster Seats posed an unreasonable risk to the safety of children in the event of a side-impact collision;

   b.   Defendant knew that the unreasonable risk to the safety of children and the results of its own internal side impact testing were unknown to and would not be easily discovered by Plaintiff and Missouri Subclass Members, and would defeat their ordinary, foreseeable and reasonable expectations concerning the performance of the Booster Seats; and

   c.   Plaintiff and Missouri Subclass Members were deceived by Defendant's failure to disclose and could not discover the unreasonable risk to the safety of children posed by the Booster Seat in the event of a side-impact collision.

118.   Plaintiff and Missouri Subclass Members suffered damages when they purchased the Booster Seats.  Defendant's unconscionable, deceptive and/or unfair practices caused actual

damages to Plaintiff and the Missouri Subclass Members who were unaware that the Booster Seat posed an unreasonable safety risk to children in the event of a side-impact collision, notwithstanding Defendant's representations at the time of purchase.

119.    Defendant's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

120.    Consumers, including Plaintiff and Missouri Subclass Members, would not have purchased the Booster Seats had they known about the unreasonable safety risk they pose to children, or the results of Defendant's internal side impact testing.

121.    As a direct and proximate result of Defendant's deceptive acts and practices, including its omissions, Plaintiff and Missouri Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages, punitive damages, and/or restitution to the extent permitted by law, including class action rules, in an amount to be proven at trial.

122.    In addition, Plaintiff and Missouri Subclass Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## COUNT III
### Unjust Enrichment
### (Plaintiff Individually and on Behalf of the Nationwide Class and/or Missouri Subclass)

123.    Plaintiff hereby realleges and incorporates by reference all allegations raised in the preceding paragraphs as if fully set forth herein.

124.    Plaintiff brings this cause of action individually and on behalf of the Class and/or Missouri Subclass against Defendant.

125. Plaintiff and Class Members conferred a monetary benefit on Defendant when they purchased the Booster Seats at issue, and Defendant had knowledge of this benefit. The average price paid by Plaintiff and Class Members for the Booster Seat was more than $40.00.

126. By its wrongful acts and omissions described within this Complaint, including the deceptive marketing, packaging, labeling, distribution, and sale of the Booster Seat as "side impacted tested" and concealing side-impact collision test results from consumers, Defendant was unjustly enriched at the expense of Plaintiff and Class Members.

127. Plaintiff and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

128. Defendants have profited from their unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and Class Members under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit. It would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with in connection with the deceptive marketing, packaging, labeling, distribution, and sale of the unsafe Booster Seats.

129. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the Booster Seats had they known that the Seats pose an unreasonable safety risk to children.

130. Defendant either knew or should have known that payments rendered by Plaintiff and Class Members were given and received with the expectation that the Booster Seats were safe for their intended use and will keep protect children in the event of a side-impact collision, as represented by Defendant in marketing, on Defendants' websites, and on the Booster Seat

labels and packaging.  It is inequitable for Defendant to retain the benefit of payments under these circumstances.

131.    Plaintiff and Class Members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant.

132.    When required, Plaintiff and Class Members are in privity with Defendant because Defendant's sale of the Booster Seats was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendant's agents for the purpose of the sale of the Booster Seats.

133.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

<u>**COUNT IV**</u>
**Fraudulent Concealment**
**(Plaintiff Individually and on Behalf of the Nationwide Class and/or**
**Missouri Subclass)**

134.    Plaintiff hereby realleges and incorporates by reference all allegations raised in the preceding paragraphs as if fully set forth herein.

135.    Plaintiff brings this claim individually and on behalf of the Class and/or Missouri Subclass.

136.    Defendant has a duty to disclose the truth regarding the side-impact safety of its Booster Seat because, *inter alia*, the safety of the seat has a direct impact on the health of the children who use the Seat.

137.    Defendant made material misrepresentations and omissions regarding the side-impact safety of the Booster Seat.

138.    Plaintiff and Class Members relied on Defendant's material misrepresentations and omissions regarding the safety of the Booster Seat.

139.    Defendant's failure to disclose that the Booster Seat was and is unsafe in the event of a side-impact collision was intentional.  Defendant was aware of the safety risks inherent in its Booster Seat, but intentionally chose not to disclose this material fact to consumers, including Plaintiff and Class Members.

140.    Defendant's fraudulent concealment of material facts regarding the safety of the Booster Seat, coupled with its deceptive marketing, packaging, labeling, and representations, induced Plaintiff and Class Members to purchase the Booster Seat.  Plaintiff and Class Members would not have purchased Defendant's Booster Seat if the truth had been disclosed to them regarding the safety (or lack thereof) of the Seat in the event of a side-impact collision.

141.    Plaintiff and Class Members had a reasonable expectation that the Booster Seat they purchased was safe for their children.  Defendant should have reasonably anticipated and intended that Plaintiff and Class Members purchased the Booster Seat, in part, based upon such expectations and assumptions, and, indeed, Defendant intended them to do so.

142.    Defendant's failure to disclose and omission of material facts regarding the safety risks inherent in its Booster Seat occurred uniformly and consistently in connection with Defendant' trade or business, was capable of deceiving and, indeed, did deceive a substantial portion of consumers, and subject the public to a serious safety risk.

143.    Defendant's failure to disclose the safety risks of its Booster Seat had the direct result of concealing material facts from and breaching Defendant's duty to disclose to Plaintiff and the Class.

144.    Beyond failing to disclose the aforementioned information, Defendant chose to actively conceal this material information regarding the safety risks posed by its Booster Seat.

145.    As a direct and proximate result of Defendant's concealment and suppression of material facts regarding the safety (or lack thereof) of its Booster Seat, Plaintiff and the Class have suffered and will continue to suffer actual economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

A.  Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.  Name Plaintiff as Class Representative, and her undersigned counsel as Class Counsel;

C.  Award damages, including compensatory, exemplary, statutory, treble, and/or punitive damages, to Plaintiff and the Class in an amount to be determined at trial;

D.  Grant restitution to Plaintiff and the Classes and require Defendant to disgorge its ill-gotten gains;

E.  Permanently enjoin Defendant from engaging in the wrongful conduct alleged herein;

F.  Award Plaintiff and the Classes their reasonable litigation expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G.  Award Plaintiff and the Classes pre- and post-judgment interest at the highest legal rate to the extent provided by law; and

H.  Award such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


DATED:  March 9, 2020                              Respectfully submitted,

                                                   */s/ Eric S. Johnson*
                                                   Eric S. Johnson (MO61680)
                                                   **SIMMONS HANLY CONROY**
                                                   One Court Street
                                                   Alton, IL 62002
                                                   T: 618-259-2222
                                                   Fax: 618-259-2251
                                                   ejohnson@simmonsfirm.com

                                                   **WHITFIELD BRYSON & MASON, LLP**

                                                   Daniel K. Bryson*
                                                   Martha Geer*
                                                   Patrick M. Wallace*
                                                   dan@wbmllp.com
                                                   martha@wbmllp.com
                                                   pat@wbmllp.com
                                                   900 W. Morgan Street
                                                   Raleigh, NC 27603
                                                   T: 919-600-5000
                                                   Fax: 919-600-5035

                                                   Harper Todd Segui*
                                                   PO Box 1483
                                                   Mount Pleasant, SC 29465
                                                   harper@wbmllp.com

**GREG COLEMAN LAW PC**
Gregory F. Coleman*
Jonathan B. Cohen*
greg@gregcolemanlaw.com
jonathan@gregcolemanlaw.com
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049

*Applications *pro hac vice* to be submitted

*Attorneys for Plaintiff and the Class*